2019 IL App (1st) 162634-U

No. 1-16-2634

Order filed November 14, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 22235 |
| | ) | |
| DESEAN LEWIS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the trial court's summary dismissal of defendant's postconviction petition where the trial court found that defendant failed to establish arguable claims of ineffective assistance of counsel and actual innocence.

¶ 2    Following a jury trial, defendant, DeSean Lewis, was found guilty of first degree murder and armed robbery and sentenced to a 55-year prison term on the murder conviction and a consecutive 6-year prison term on the armed robbery conviction. On direct appeal, this court affirmed. *People v. Lewis*, 2014 IL App (1st) 130687-U.

¶ 3    In July 2016, defendant filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), which the trial court summarily dismissed as frivolous and without merit. Defendant appeals, arguing the court erred in summarily dismissing his petition. We affirm.

¶ 4    Defendant's arrest and prosecution arose out of the death of Marvin Poole, who was fatally shot on August 11, 2009, after defendant and Poole argued over a $10 bet that was made during a dice game. The matter proceeded to a jury trial, at which the following evidence was presented.

¶ 5    Joseph Hammond testified he had known defendant for "many years" and was friends with Poole for 12 to 13 years prior to Poole's death. In the evening on August 11, 2009, Hammond went to a birthday party at Raster Elementary School. After a couple of hours, Hammond was standing outside a fence which surrounded the schoolyard and heard "maybe two" gunshots. Hammond observed defendant run through a gate in the fence and run toward an alley holding a gun. Hammond denied telling Detective Michael O'Donnell he observed defendant shoot Poole or that defendant and Poole had argued during a dice game. Hammond acknowledged he had prior felony convictions for possession of a stolen motor vehicle, possession of a controlled substance, and aggravated unlawful use of a weapon. He had consumed two or three beers in the two hours he was at the party.

¶ 6    James Coaks testified that during the party, seven to eight individuals began playing dice. He did not join but watched the game. He heard defendant, whom he knew from the neighborhood, and Poole arguing over a $10 bet. After defendant and Poole exchanged words, defendant took off his shirt, indicating he wanted to fight Poole. A man, whom Coaks had seen

around the neighborhood and who he knew was defendant's friend, was standing next to defendant during the game. The man subsequently was identified at trial as Sherard Nance. Nance briefly left the area and returned and gave defendant a gun. Defendant then shot Poole at close range. Coaks admitted he had a prior felony conviction for possession of a controlled substance and admitted to consuming two beers at the party. He also acknowledged he did not speak to the police until August 13, 2009, at which time he identified defendant as the shooter from a photographic lineup.

¶ 7     Poole's best friend, Shundwall Russell, testified he had been arrested in Iowa and was on electronic home monitoring as a result of his failure to appear to testify in this case. Russell did not previously appear to testify because he was afraid. Furthermore, he had applied for and expected to receive $750 in relocation expenses from the State. Russell and Poole arrived at the party around 7 p.m. and joined the dice game shortly after they arrived. Russell described the argument between defendant and Poole, which occurred at about 10 p.m., in detail. During the argument, Russell observed a person, whom he later identified as Nance, approach defendant from behind and tap him on his back. Defendant reached behind him and pulled out a gun which he then pointed at Poole. Defendant demanded $10 from Poole, who complied. Nance told defendant he should take all Poole's money. Defendant then took all Poole's money, and said he "might as well go ahead and knock [Poole] off," and then shot him.

¶ 8     Russell testified he came to Poole's aid in the middle of the street outside the schoolyard and observed two bullet holes in Poole's chest. Russell called the paramedics and then followed the ambulance to the hospital, where Poole later died. Before following the ambulance from the scene, Russell spoke with the police and told them defendant had a "funny haircut" but did not

give them details about what he had observed. Russell's written statement dated August 16, 2009, did not include any description of defendant, including his hairstyle.

¶ 9     Nance testified he had been indicted along with defendant for first degree murder in the shooting death of Poole but asserted he had been framed. He did not remember being at the party where someone was shot or making a statement to the police that he handed a gun to defendant who then shot Poole. Nance acknowledged he pled guilty to a charge of conspiracy to commit murder and received a sentence of 12 years, despite the fact he was facing 35 to 75 years in prison if convicted of first degree murder. He did not recall identifying defendant during his plea hearing as the person who shot defendant. Nance's trial testimony was impeached with the transcript from his plea hearing and his recorded statement to police, in both of which he acknowledged he handed a gun to defendant and defendant shot Poole.

¶ 10    O'Donnell testified that, after going to the crime scene while evidence was being collected, he spoke on the telephone with Russell, who was at Christ Hospital with Poole. Russell came to the station the next day to speak with O'Donnell and told him what happened leading up to and after the shooting. During this first meeting, Russell could not identify defendant in a photographic lineup but said he could do so in a physical lineup, which he later did. Russell gave a statement on August 16, 2009, in which he told O'Donnell and an assistant State's Attorney he heard a second shot as he ran. O'Donnell also spoke with Hammond, who testified he observed defendant shoot Poole and that it "all occurred because of a dice game."

¶ 11    The parties entered a stipulation which reflected that, if called to testify, a forensic scientist would testify Poole's death was caused by a single gunshot wound to his chest.

¶ 12    The jury found defendant guilty of first degree murder and armed robbery. The trial court sentenced defendant to consecutive prison terms of 55 years for first degree murder and 6 years for the armed robbery.

¶ 13    On direct appeal, defendant contended his trial attorney rendered ineffective assistance where he failed to object to certain arguments made by the State and to a witness's testimony. *People v. Lewis*, 2014 IL App (1st) 130687-U, ¶ 1. We affirmed, concluding his attorney's performance in failing to object was deficient but defendant could not show he was prejudiced by the deficient performance. *Lewis*, 2014 IL App (1st) 130687-U, ¶¶ 14-18.

¶ 14    In July 2016, defendant *pro se* filed a petition pursuant to section 122-1(b) of the Act (725 ILCS 5/122-1(b) (West 2016)). In his petition, defendant alleged that on July 29, 2009, less than two weeks before the shooting of Poole, he was shot in the leg and neck, which resulted in an ankle fracture and fracture "in the neck area."[1] The ankle fracture required him to be on crutches for six weeks and he was casted for the fracture up to the middle of his leg. According to defendant's petition, the ankle fracture "made it impossible to walk or run on his own and the crutches and bandaging were identifiable characteristics that witnesses would have identified about [defendant] if he had been the shooter in this case," but the State's witnesses did not describe these characteristics in their descriptions of the shooter. Furthermore, defendant alleged the State's witnesses testified defendant ran from the scene, which was impossible for him to do at the time because he was on crutches.

¶ 15    Defendant alleged he informed his trial attorney of his injuries and condition, and he asked his attorney to obtain and present his medical records as evidence. Defendant's attorney

---

[1] In his petition, defendant alleged he was shot on July 29, 2009, but in his affidavit he avers he was shot on July 26, 2009, which is confirmed by the medical records attached to his petition.

told defendant he would obtain the records but, on the day of trial, he did not have possession of the records. Defendant's attorney told defendant he was going to request a continuance to obtain the records, but never did so.

¶ 16    Defendant also alleged he informed his attorney he was at home with Patrice and Limell Freeman at the time of the offense. He told his attorney multiple times where the Freemans lived and both were willing to speak with defendant's attorney and testify on his behalf. Defendant alleged his attorney never spoke with Patrice or Limell, who would have testified defendant was with them at the time of the offense and was still caring for the debilitating injuries he had suffered two weeks prior to the offense.

¶ 17    Defendant further alleged one of the State's "key witnesses," Hammond, recanted his trial testimony and had averred, in a sworn affidavit, he was forced by a detective to make a false statement and provide false testimony implicating defendant.

¶ 18    Based on his allegations, defendant raised the following claims in his petition. First, defendant asserted a claim of actual innocence based on Hammond's recantation of his trial testimony. Second, defendant contended his trial counsel was ineffective because he failed to obtain and present the medical records relating to the injuries he sustained in July 2009. Third, he contended his trial counsel was ineffective because he failed to call Limell Freeman as a witness, who would have supported an alibi defense by testifying he was with defendant on August 11, 2009, and was helping defendant around the house because defendant "could barely do anything" due to his gunshot injuries.

¶ 19    Defendant attached to his petition his own affidavit, affidavits signed by Limell and Hammond, and medical records from Christ Hospital. In his affidavit, defendant averred he

informed his trial counsel that counsel needed to obtain his medical records because they would show he was physically unable to commit the crime, and he provided counsel with the Freemans' names. Defendant averred his counsel spoke to Patrice and knew she could provide an alibi defense, but he never spoke to Limell despite being provided his address and phone number.

¶ 20     Additionally, defendant averred that, on the day trial commenced, his counsel was not in possession of and had not made a request for his medical records. Defendant's attorney told defendant he was going to request a continuance to obtain those records but did not do so. Defendant averred the medical records showed he was shot in the leg and neck on July 26, 2009, and was taken to Christ Hospital, where he was treated for an ankle fracture. According to defendant's affidavit, the medical records were critical to his case because they showed he was disabled on the date of the shooting and that it would have been impossible for him to run as indicated by the witnesses. Further, it would have proved the witnesses' identifications of him as the shooter were mistaken because none of the witnesses testified the shooter had a cast on his leg, was using crutches, or had bandaging on his neck.

¶ 21     In his affidavit, Hammond averred, in full, that he was forced into making a false statement against defendant, that he was forced by a detective to lie during his testimony, and that he could not sleep at night knowing he put an "innoc[e]nce [*sic*] kid away."

¶ 22     In his affidavit, Limell averred, in full, as follows:

> "On August 11, 2009 I was at my [mother's] apartment. My brother in-law [defendant] was living with us at the time. That day I stayed home with [defendant] to help him around the house, because he could barely do anything he had recently got shot in his ankle. I've told his previous attorney I would testify, but he never reached out to

me! I know for a fact [defendant] did not leave the house this day (August 11, 2009) because as I stated before I was home with him all day! I wasn't threaten [*sic*] or promised anything I'm just positive he was home all day and so was I."

¶ 23 The medical records attached to defendant's petition contained a report from a computerized tomography (CT) scan of defendant's neck, which showed a soft tissue and muscular gunshot injury to the base of the left side of defendant's neck and a chronic fracture which was not conclusively caused by the gunshot injury to defendant's neck. The records also contained a report from an X-ray of defendant's tibia, which revealed a fracture in his ankle and a possible second fracture. The records also indicated defendant's ankle was placed in a splint and, after demonstrating he was able to ambulate with crutches, he was discharged home with instructions to consult with an orthopedic surgeon.

¶ 24 The trial court entered a written order dismissing defendant's petition. This appeal followed.

¶ 25 The Act sets forth a procedure under which a criminal defendant can assert that his or her conviction was the result of a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act contemplates a three-stage proceeding, which is initiated by the filing of a petition. *Hodges*, 234 Ill. 2d at 9; 725 ILCS 5/122-1(b) (West 2016). The petition must "clearly set forth the respects in which [the defendant's] constitutional rights were violated." 725 ILCS 5/122-2 (West 2016). The defendant must attach affidavits, records, or other evidence to support his or her allegations or shall state why same is not attached, but the petition need not contain argument or citation and discussion of pertinent authority. 725 ILCS 5/122-2 (West 2016).

¶ 26   The trial court dismissed defendant's petition at the first stage. At the first stage, the trial court determines whether, taking all well-pled facts in the petition and supporting materials as true, the petition states the gist of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The court must dismiss the petition if it is frivolous and patently without merit. *Edwards*, 197 Ill. 2d at 244. A petition is frivolous and patently where it has no arguable basis in law or in fact. *Hodges*, 234 Ill. 2d at 16. "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. Indisputably meritless legal theories are those which are completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations are "those which are fantastic or delusional." *Hodges*, 234 Ill. 2d at 17.

¶ 27   We review *de novo* first-stage dismissals under the Act. *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). Accordingly, we review the trial court's judgment and not its reasoning, and we may affirm the judgment on any basis supported by the record. *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 37.

¶ 28   Defendant first contends the trial court erred by summarily dismissing his petition where he raised arguable claims of ineffective assistance of counsel. Defendant's claims relate to his trial attorney's failure to (1) obtain and present medical evidence which would have established he was unable to commit the crime at issue; and (2) call Limell Freeman as a witness, who could have provided an alibi defense. According to defendant, his petition met the low "arguable" standard applied at the first stage of postconviction proceedings.

¶ 29   To prevail on a claim of ineffective assistance of counsel, the defendant must show his counsel's performance fell below an objectively reasonable standard and the deficient

performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). Thus, "[a]t the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Petrenko*, 237 Ill. 2d at 497. Because defendant must meet his burden on both the performance and prejudice prongs, courts may resolve ineffective assistance claims by deciding only the prejudice prong. *People v. Boyd*, 347 Ill. App. 3d 321, 329 (2004) (citing *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998)).

¶ 30 A defendant makes an arguable showing of prejudice caused by his counsel's deficient performance where there is a reasonable probability, but for counsel's unprofessional errors, the result at trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When, as here, a defendant challenges his conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the fact finder would have had a reasonable doubt regarding guilt. *Strickland*, 466 U.S. at 695.

¶ 31 Defendant contends he was arguably prejudiced by his counsel's failure to present the medical evidence because it "would have dramatically undercut the testimony of the State's witnesses and the State's case entirely." According to defendant, the medical evidence and defendant's and Limell's affidavits, taken as true, demonstrate defendant was on crutches for six weeks and wore a cast and was therefore physically unable to run at the time of the shooting, which would have undercut Hammond's and Coaks' testimony that defendant ran away after the shooting.

¶ 32   The medical records attached to defendant's petition establish that he sustained an ankle fracture 16 days prior to the shooting death of Marvin Poole. Defendant's ankle was splinted at the hospital, and he was discharged after demonstrating he was able to ambulate with crutches with instructions to follow up with an orthopedic surgeon. Defendant did not attach medical records from any subsequent doctor visits which demonstrated any further medical treatment putting him in a cast or on crutches at the time of the offense. Defendant's allegation in his petition (which is not included in his affidavit) that he was in a cast "up to the middle of his leg" is contradicted by the medical records, which state his leg was placed in a splint. In short, nothing in the medical records or defendant's petition, his affidavit, Limell's affidavit, or Hammond's affidavit, other than defendant's own conclusory assertion, demonstrate it was physically impossible for him to shoot Poole or that gait was restricted substantially.

¶ 33   Even if defendant's attorney had presented the medical record evidence, the jury heard testimony from two disinterested witnesses who identified defendant as the person who shot and killed Poole. One of these witnesses, Coaks, knew defendant from the neighborhood. The other, Russell, had been playing dice with defendant for more than two hours when he observed defendant shoot and kill Poole. Moreover, the jury heard Nance's prior acknowledgement of the factual basis for his guilty plea, and his recorded statement in which he stated he handed defendant a gun which defendant used to shoot Poole. Hammond's testimony at trial, though it has now been recanted, corroborated the three eyewitness accounts of the shooting. Hearing evidence that defendant was in a splint two weeks prior to the shooting would not have arguably changed the result at trial.

¶ 34    Defendant also argues the trial court erred when it summarily dismissed his claim that his trial counsel was ineffective for failing to call Limell as a witness. According to defendant, Limell's affidavit would have shown both that he was not at the scene and that defendant's injury rendered him physically incapable of committing the offense. On the issue of prejudice, defendant argues his attorney's failure to investigate and present Limell's testimony was arguably prejudicial because Limell's testimony would have changed the weight of the evidence against defendant and would have significantly undermined the testimony of the State's witnesses. We do not find defendant's argument persuasive.

¶ 35    Limell's affidavit established he was with defendant on August 11, 2009, at his mother's apartment. Limell stayed home "that day" to help defendant around the house because "he could barely do anything" due to his ankle injury. Limell's affidavit states he was "positive" that defendant did not leave the home "that day" because he was home with defendant "all day."

¶ 36    Limell's affidavit does not, as defendant asserts, establish defendant was not at the scene at the time of the shooting, nor does it establish defendant was physically incapable of committing the offense. Limell's affidavit establishes only that Limell was with defendant during the day on August 11, 2009; however, the evidence at trial establishes defendant was at a dice game which commenced after 7 p.m. and the shooting occurred after 10 p.m. Limell's statement that defendant could "barely do anything" does not establish he could not have participated in the dice game or shot Poole.

¶ 37    Even if defendant's attorney had presented Limell's proposed testimony, we are not convinced defendant has shown it is arguable there is a reasonable probability the result at trial would have been different. See *Petrenko*, 237 Ill. 2d at 497; *Strickland*, 466 U.S. at 694. As

stated above, the jury heard testimony from two disinterested witnesses who identified defendant as the person who shot and killed Poole. Moreover, the jury heard Nance's prior testimony and recorded statement, and Hammond's testimony corroborated the three eyewitness accounts of the shooting.

¶ 38    Defendant contends Limell's affidavit would have changed the weight of the evidence against defendant, especially where the credibility of the State's witnesses was called into doubt during their testimony. Defendant contends Coaks' credibility was called into doubt by his prior felony conviction, his consumption of alcohol at the party, and the fact he did not wait at the crime scene to speak with police. However, Coaks admitted his prior felony conviction and explained he had consumed only two beers between the time he arrived at the party at 4 p.m. and when Poole was shot at 10 p.m. While Coaks' credibility was certainly affected by his prior conviction and his use of alcohol, the record also reveals that he had ample opportunity to observe defendant during and immediately following the argument between defendant and Poole, and he positively identified defendant as the shooter shortly after the offense. His testimony that he observed defendant, whom he knew from the neighborhood, take an object from Nance and shoot Poole in the chest was not so wholly incredible or thoroughly impeached that it was incapable of belief. See *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 15.

¶ 39    Defendant also contends Hammond's credibility was called into question by his prior felony convictions, his consumption of alcohol at the party, and the fact he did not wait to speak with police after Poole's shooting. Defendant contends Hammond's credibility was further impeached by his denial, at trial, that he told O'Donnell he observed the shooting and that the

shooting occurred because of a dice game where O'Donnell testified Hammond made both of those statements.

¶ 40    However, Hammond admitted his prior felony conviction and explained he had consumed only two to three beers during the two hours he was at the party. While Hammond's credibility was certainly affected by his prior conviction and his use of alcohol, the record does not indicate Hammond was intoxicated and also reveals that he had ample opportunity to observe defendant immediately after the shooting. While Hammond was impeached on the immaterial issue of what he told O'Donnell, his testimony that he observed defendant, whom he had known for "many years," run past him with a gun in his hand was not so wholly incredible or thoroughly impeached that it was incapable of belief. See *Sanders*, 2012 IL App (1st) 102040, ¶ 15.

¶ 41    With respect to Russell, defendant contends his credibility was called into question by the fact he had never viewed defendant before the shooting and subsequently failed to appear in this case, leading to his arrest in Iowa. However, Russell testified he did not appear and was subsequently arrested because he feared for his safety. Other than the inconsistencies relating to whether Russell spoke to the police for the first time at the scene or at the hospital and his testimony he observed two bullet holes in Poole's chest despite the fact Poole was only shot once, Russell's testimony was unimpeached and it established he observed defendant shoot Poole. See *People v. Howard*, 376 Ill. App. 3d 322, 329-30 (2007) (minor discrepancies or inconsistencies on in witness testimony on immaterial issues do not render it unworthy of belief).

¶ 42    Defendant contends Nance's credibility was rendered wholly incapable of belief because he made inconsistent statements under oath at his plea hearing and at defendant's trial. However, even if Nance's prior statements were wholly unworthy of belief and were disregarded by the

jury, we do not find defendant has shown it is arguable he was prejudiced by the failure to present Limell's testimony. The jury heard testimony from two eyewitnesses, both of whom had ample opportunity to observe defendant both before and during the shooting and whose testimony was unimpeached on any material issue, that observed defendant shoot Poole.

¶ 43    Defendant again argues none of the State's witnesses indicated the shooter had crutches or a cast, and their failure to mention these distinguishing features undermined the witnesses' identifications of defendant. However, the witnesses' failure to mention defendant's cast or crutches did not render their identifications unreliable. See *Slim*, 127 Ill. 2d at 307-08. We do not know whether defendant had his pants over the cast or whether he had crutches at the time.

¶ 44    Defendant also argues the trial court entered erroneous rulings in its written order dismissing his claims of ineffective assistance of counsel. First, defendant contends the trial court erred by finding he had waived these claims by failing to raise them on direct appeal. See, *e.g.*, *People v. Tate*, 2012 IL 112214, ¶ 14 (postconviction ineffective assistance claims based on matters not appearing in the record are not subject to procedural default rules). Second, defendant contends the trial court erred by concluding his attorney's decision not to pursue the evidence was a valid strategy decision. See *Tate*, 2012 IL 112214, ¶ 22 (strategy considerations are generally inappropriate during first-stage proceedings). However, the trial court's reasoning is not at issue in our *de novo* review; rather, we review the court's judgment and may affirm on any basis supported by the record if the judgment is correct. See *Knapp*, 2019 IL App (2d) 160162, ¶ 37. Accordingly, we conclude the court properly dismissed defendant's claims his attorney was ineffective for failing to investigate and present the medical evidence or Limell's testimony where it is not arguable defendant was prejudiced by the failure to do so.

¶ 45    Defendant next contends the trial court erred by summarily dismissing his petition where it raised an arguable claim he was denied his right to due process under a theory of either actual innocence or knowing use of perjured testimony, as shown in Hammond's affidavit recanting his testimony.

¶ 46    An actual innocence claim must be supported by evidence that is new, material, noncumulative, and of such conclusive character that it would likely change the result on retrial. *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 14 (citing *People v. Coleman*, 2013 IL 113307, ¶ 84). "[A] claim of actual innocence does not merely question the defendant's guilt, but is so conclusive as to be capable of completely exonerating the defendant." *Wallace*, 2015 IL App (3d) 130489, ¶ 17.

¶ 47    As an initial matter, Hammond's affidavit, in which he states he was forced by a detective to make a false statement and give false testimony, does not contain sufficient factual detail to support defendant's claim of actual innocence. The Act requires the defendant to present only a limited amount of factual detail in the petition. *People v. Delton*, 227 Ill. 2d 247, 254 (2008) (citing *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). "However a 'limited amount of detail' does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation." *Delton*, 227 Ill. 2d at 254. The purpose of the requirement that the defendant attach factual material to support the petition is rooted in the concern that a petition's allegations must be capable of objective or independent corroboration. *Delton*, 227 Ill. 2d at 254. "[T]he affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *Delton*, 227 Ill. 2d at 254.

¶ 48    Hammond's affidavit contains only vague, conclusory statements that he was forced to "mak[e] a false statement concerning [defendant]" and was forced "by Dective [*sic*] to lie on the stand." His affidavit does not state why he made the false statement or by what means he was forced to make a false statement or lie on the stand, who forced him to make the false statement or lie, what his false statement consisted of, what "lie" he told on the stand, or whether his entire testimony, or merely parts thereof, was false. Accordingly, we conclude defendant's petition does not contain sufficient factual detail to support his claim of actual innocence.

¶ 49    A claim of actual innocence requires a showing the evidence is of such conclusive character that it would probably change the result at retrial. *Wallace*, 2015 IL App (3d) 130489, ¶ 14. Thus, we may affirm the summary dismissal of defendant's claim of actual innocence if Hammond's recantation fails to arguably establish the result would probably change the result at trial. See *Wallace*, 2015 IL App (3d) 130489, ¶ 14.

¶ 50    The conclusiveness of the new evidence is the most important element of an actual innocence claim. *People v. Allen*, 2015 IL 113135, ¶ 22. The hallmark of an actual innocence claim is total vindication or exoneration, not merely a reasonable doubt of the defendant's innocence. *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 23. In other words, an actual innocence claim does not merely challenge the strength of the State's case against the defendant; rather, it is a claim the defendant is free of any criminal involvement. *Mabrey*, 2016 IL App (1st) 141359, ¶ 23.

¶ 51    As the trial court found in this case, defendant's claim of actual innocence is merely a challenge to the sufficiency of the evidence. Hammond's recantation does not exonerate defendant in light of Russell's and Coaks' testimony they were present during the shooting and

observed defendant shoot Poole after arguing about a $10 bet in a dice game. Rather, his recantation bears only on the sufficiency of the evidence, a claim which is not cognizable under the Act. See *People v. Dunn*, 52 Ill. 2d 400, 402 (1972); *Mabrey*, 2016 IL App (1st) 141359, ¶ 23.

¶ 52    Even if we were to accept the actual innocence label defendant attached to this claim, we would reach the same result. Defendant asserts it is at least arguable Hammond's affidavit would change the result of defendant's trial because Hammond was a key witness for the State. According to defendant, this was demonstrated by the State's repeated reliance on his testimony during its closing arguments. Defendant argues that, without Hammond's testimony, the State's case would rest on the testimony of Russell, Coaks, and Nance, whose testimony was called into question at trial. We do not find this argument persuasive.

¶ 53    Contrary to defendant's contention, Hammond was not a key witness for the State. Hammond's trial testimony established only that he observed defendant running away from the party while carrying a gun. Although O'Donnell's testimony completed the impeachment of Hammond on the issue of whether Hammond previously told O'Donnell that he observed defendant shoot Poole, no evidence was presented as to what Hammond, in fact, told O'Donnell.

¶ 54    In any event, Hammond's trial testimony served only to corroborate the testimony of the three eyewitnesses who observed defendant shoot Poole. Defendant again contends the credibility of the eyewitnesses was called into doubt during their testimony. As we explained above, Russell's testimony was not impeached or inconsistent on any material issue, and Coaks' testimony was not so thoroughly impeached that it was incapable of belief. See *Howard*, 376 Ill. App. 3d at 329-30; *Sanders*, 2012 IL App (1st) 102040, ¶ 15. It was the job of the jury to decide

the credibility of the witness. *People v. Green*, 2017 IL App (1st) 152513, ¶ 102. Even if the jury totally disregarded Nance's testimony, Hammond's recantation was not of such conclusive character that it would probably change the result on retrial in light of the testimony from Russell and Coaks. Accordingly, we affirm the trial court's summary dismissal of defendant's actual innocence claim.

¶ 55    In his opening brief, defendant asserts in the alternative that his petition established an arguable claim his due process rights were violated by the State's knowing use of Hammond's perjured testimony. Recognizing this claim was not explicitly raised in his petition, defendant argues his petition should be liberally construed to include this claim. According to defendant, his petition set forth an arguable claim on this basis where Hammond's affidavit states he was forced to make a false statement and forced by a detective to lie on the stand.

¶ 56    The State responds that defendant forfeited this claim because he failed to raise it in his petition and instead raised it for the first time on appeal. Further, the State argues even if defendant's claim was not forfeited by his failure to explicitly raise it in his petition, his claim the State knowingly used perjured testimony would fail on the merits.

¶ 57    The State's strict construction of defendant's petition is inconsistent with the requirement that a *pro se* petition must be given a liberal construction. *Hodges*, 234 Ill. 2d at 21. Indeed, at the first stage, a *pro se* petition need only bear some relationship to the issue raised on appeal where it alleges enough facts to support a constitutional claim. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48. While defendant couches his claim based on Hammond's affidavit as an actual innocence claim, the factual allegations of his petition could arguably be read as raising a claim the State knowingly used perjured testimony. See *Thomas*, 2014 IL App (2d) 121001, ¶¶

59-63 (rejecting the State's forfeiture argument where the petition's factual allegations fit what defendant argued on appeal despite the fact the petition asserted a different claim based on the same facts). Therefore, we will address defendant's claim.

¶ 58   The knowing use of perjured testimony to obtain a conviction is a violation of the defendant's right to due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). Where there is a reasonable likelihood that false testimony could have affected the jury's verdict, the conviction obtained by false testimony must be set aside. *Olinger*, 176 Ill. 2d at 345. "In order to establish a violation of due process, the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough." *Olinger*, 176 Ill. 2d at 345. "The prosecution is charged with the knowledge of its agents, including the police." *People v. Ellis*, 315 Ill. App. 3d 1108, 1113 (2000).

¶ 59   As we explained above, Hammond's bare-bones affidavit lacks specific factual detail. It therefore does not contain sufficient factual detail to support an arguable claim the State knowingly used perjured testimony to secure defendant's conviction. Moreover, for the reasons previously stated, it is not reasonably likely Hammond's testimony affected the jury's verdict; thus, any conviction obtained by that "false" testimony need not be set aside. Accordingly, we affirm the trial court's first-stage dismissal of defendant's petition.

¶ 60   For the reasons stated, we affirm the trial court's judgment.

¶ 61   Affirmed.